IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| OREGON TROLLERS ASSOCIATION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CARLOS M. GUTIERREZ, et al., | ) ) |
| Defendants, | ) ) |
| and | ) ) |
| THE YUROK TRIBE and THE HOOPA VALLEY TRIBE, | ) ) ) |
| Intervenor-Defendants. | ) ) |

Civil No. 05-6165-TC

ORDER

COFFIN, Magistrate Judge.

Plaintiffs - individuals, businesses and organizations who make their living, in full or in part,

on the southern Oregon and/or northern California chinook salmon fishery - brought this action to

1 - ORDER

challenge the 2005 management measures for the Pacific Coast ocean salmon fishery.[1] Plaintiffs allege that in the promulgation of such measures, defendants violated the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"),[2] the Administrative Procedure Act ("APA"),[3] and the Regulatory Flexibility Act ("RFA").[4] Presently before the court are plaintiffs' motion (#50) for summary judgment, defendants' cross-motion[5] (#59) for summary judgment, and intervenor-defendant Yurok Tribe's cross-motion (#65) for summary judgment.[6]

## STATUTORY AND REGULATORY BACKGROUND

In 1976, Congress enacted the Magnuson Act as a response to overfishing and inadequate conservation measures that were threatening future commercial and recreational fishing, as well as the survival of a number of species of fish. See 16 U.S.C. § 1801(a). The Magnuson Act was to

---

[1]Final rule: annual management measures for the ocean salmon fishery, 70 Fed. Reg. 23,054 (May 4, 2005).

[2]16 U.S.C. §§ 1801-1883.

[3]5 U.S.C. §§ 551-706.

[4]5 U.S.C. §§ 601-612.

[5]The Hoopa Valley Tribe, as intervenor-defendant, has joined in defendants' motion for summary judgment and in fellow intervenor-defendant Yurok Tribe's motion for summary judgment, and has filed supporting briefs. Although I considered the tribes' briefs, because I resolve the issues in the case on the basis of defendants' arguments, I do not specifically address the issues raised by the tribes.

[6]Also before the court is defendants' motion (#57) to strike what they characterize as plaintiff's extra-record declarations. That motion is denied. While I will not evaluate the substance of the decisions made by defendants on the basis of material they did not consider in making such decisions, the materials submitted by plaintiffs are nonetheless useful to me in effectively reviewing all of the circumstances surrounding defendants' decision-making. I believe that absent this fuller record, effective judicial review would be impossible. See Public Power Council v. Johnson, 674 F.2d 791, 793-95 (9th Cir. 1992). I would also note that I am considering defendants' extra-record materials, which they offer "to put this discussion in context." Defendants' Reply (#76) at 15, n.9.

2 - ORDER

provide for "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b)(5). Regional Fishery Management Councils were established to exercise stewardship of the fisheries "through the preparation, monitoring, and revision of such plans," in conjunction with the participation and advice of interested parties and after consideration of the social and economic needs of the states. 16 U.S.C. § 1801(b)(5). Ultimately, the Secretary of Commerce ("Secretary"), acting through the National Marine Fisheries Service ("NMFS"), bears responsibility for reviewing the management plans, as well as any amendments thereto, for consistency with ten national standards (set forth in 16 U.S.C. § 1851(a)) and "any other applicable law." 16 U.S.C. § 1854(a)(1)(A). Upon the Secretary's receipt of a plan or amendment, the Secretary commences such a review, and the plan or amendment is concurrently published in the Federal Register. 16 U.S.C. § 1854(a). If, after a 60-day comment and review period, the Secretary approves the plan, implementing regulations are promulgated. Id. All plans and implementing regulations must be consistent with the ten national standards for fishery conservation and management set out in § 301 of the Magnuson Act. 16 U.S.C. § 1851(a).[7]

---

[7]The ten standards set forth in § 301 require that:

    (1)    Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

    (2)    Conservation and management measures shall be based upon the best scientific information available.

    (3)    To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

    (4)    Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires and excessive share of such

Similarly, the Secretary is charged with reviewing "proposed regulations" submitted by Regional Councils, to ensure that they are consistent with the applicable fishery management plan and "any other applicable law." 16 U.S.C. § 1854(b). Such proposed regulations are published in the Federal Register for a comment period of 15-60 days, and, upon approval by the Secretary after the close of public comment, are promulgated as final regulations. Id. The "proposed regulations" subject to this notice and comment period are those which the Council deems "necessary or appropriate for the purposes of (1) implementing a fishery management plan or amendment . . . and (2) making modifications to regulations implementing a fishery management plan or plan amendment." 16 U.S.C. § 1853(c). Additionally, any "rulemaking" by NMFS is subject to the APA's notice and comment provisions, unless an APA exception applies.

---

                privileges.

(5)      Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6)      Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7)      Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8)      Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9)      Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10)    Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

NMFS has also promulgated advisory guidelines based on the ten national standards. See 50 C.F.R. §§ 600.305-340.

4 - ORDER

As well as borrowing the APA's notice and comment provisions for rulemaking, the Magnuson Act incorporates the judicial review standards set forth in the APA. Those standards call for the court to "hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Midwater Trawlers Co-op v. Dept. of Commerce, 282 F.3d 710, 716 (9th Cir. 2002).

Stemming from agencies' APA obligations are further analyses that must be undertaken pursuant to the RFA. Under § 603 of that Act, any time an agency is required by the APA to publish a general notice of proposed rulemaking, the agency must prepare and make available for public comment an initial regulatory flexibility analysis. Section 604 of the RFA mandates that an agency also prepare a final RFA analysis when the agency, after being required by the APA or other law to publish a general notice of proposed rulemaking, promulgates a final rule.

## FACTUAL BACKGROUND[8]

For almost 30 years, the pacific ocean salmon fisheries in the United States' exclusive economic zone have been managed under what is now the Pacific Coast Salmon Fishery Management Plan ("FMP"). After formal amendments to the 1978 FMP (which itself replaced the original 1977 FMP) were proposed, evaluated, and approved each year from 1979 to 1983 - a costly and bureaucratically complex annual process which lacked a long-term focus - the Pacific Fishery Management Council ("Council") in 1984 proposed, and the Secretary adopted, a comprehensive framework amendment which replaced the 1978 FMP and established a fixed set of management objectives with flexible elements to allow annual management measures to be tailored to changes in stock abundance and other critical factors. In 1989, Amendment 9 to the FMP was approved,

---

[8]The background set forth is taken from the administrative record on file.

5 - ORDER

establishing, <u>inter alia</u>, an escapement goal of 33-34 percent of potential adult natural spawners for Klamath River fall chinook, with a floor of no less than 35,000 naturally spawning fall chinook.[9] Subsequently, annual management measures for Klamath River fall chinook were required to provide for a minimum escapement of 35,000 naturally spawning fall chinook; each year's measures have since conformed to this objective. Although in most years the 35,000 fish escapement floor has not been the driver of fishing season and catch restrictions - in better years, the objective is an escapement of 33-34 percent of potential adult spawners, and the floor is not a necessary component of that objective - there have been years where the floor necessarily drove the limits.[10]

Examining, with the benefit of hindsight, the 2004 Klamath River chinook season, it is clear that the management objectives were not met and the projections upon which conservation goals were set were woefully inaccurate. The 2004 river run size was predicted to be 96,800 adults, but in actuality turned out to be approximately 79,000 adults, of which only approximately 24,300 returned to spawn in natural areas. Thus, for 2004, the minimum escapement goal was deficient by over 10,000 fish, a full 30 percent of the floor. The age-4 component of the ocean harvest, subject to a 16% harvest limit because of an Endangered Species Act consultation standard,[11] was projected

---

[9]This escapement floor is not subject to annual change. <u>See</u> 50 C.F.R. 660.410(b)(1) (providing, in relevant part, that "NMFS is authorized . . . to modify an escapement goal if . . . [a] comprehensive technical review of the best scientific information available provides conclusive evidence that, in the view of the Council, the Scientific and Statistical Committee, and the Salmon Technical Team, justifies modification of a conservation objective; <u>except that the 35,000 natural spawner floor for Klamath River fall chinook may be changed only through amendment</u>.") (emphasis supplied).

[10]In 1992, for example, the fishing season was even more restrictive then the measures for 2005 call for, to allow for the 35,000 fish escapement objective to be met.

[11]The California coastal chinook is listed as a threatened species under the Endangered Species Act. Because not enough is known about the California coastal chinook stock, the Klamath

to be 15% of the age-4 stock; the postseason estimate of the actual age-4 harvest, however, was 52.4%, over three times the acceptable harvest percentage. With this data coming in, the Council began to plan for the 2005 management regulations.

In January 2005, the Salmon Technical Team ("STT")[12] and the Council's staff economist met to develop the <u>Review of 2004 Ocean Salmon Fisheries</u>, a document which summarized the 2004 seasons, quotas, harvest, escapement, socioeconomic statistics, management goals and achievements, and impacts on ESA-listed species. The preliminary report reflected much of the above-described failure of the 2004 measures to accomplish the required management objectives, including the 35,000 naturally spawning fish escapement requirement. The Klamath River Technical Advisory Team ("TAT")[13] prepared and released two documents examining the 2004 Klamath River fall chinook run and projecting the abundance and prospective harvest levels of Klamath River fall chinook for the 2005 seasons.

In February 2005, the first preseason analysis, <u>Preseason Report I: Stock Abundance Analysis for 2005 Ocean Salmon Fisheries</u>, was developed to aid the creation of 2005 fishery management options, and provided, <u>inter alia</u>, salmon stock abundance estimates as well as harvest and escapement estimates based on the 2004 management measures. The report estimated that repeating the 2004 management regulations for 2005 would "be expected to result in fewer than 35,000 natural

---

River fall chinook, which is better understood, is used as a surrogate stock to estimate the health and impact of management measures on the California coastal chinook stock.

[12]The Salmon Technical Team is a group of eight state, federal, and tribal salmon specialists.

[13]The Technical Advisory Team is a group which provides biological and statistical expertise to aid the Council in the status of the stocks of anadromous fish (fish, such as salmon, which spend part of their life cycle in a river and the remainder in the ocean) in the Klamath Basin and the impacts of fishery management options.

7 - ORDER

area adult spawners, and, thus, fail to meet the minimum spawner requirement." It further found that repeating the 2004 regulations would result in an ocean harvest rate of greater than 16% of the age-4 Klamath River fall chinook, violating the ESA consultation standard.

Between February 24 and March 6, 2005, the state and tribal agencies went back to their constituents to discuss the preseason reports and range of likely fishery management options. The Klamath Fishery Management Council ("KFMC")[14] also met to prepare recommendations for management options.

From March 6-11, 2005, the Council met in Sacramento, California, to prepare 2005 regulatory options for public review. Among various other meetings and presentations at the conference, the KFMC presented its report, which noted, inter alia, that the 2004 season had been the first season in five years to fail to meet the minimum escapement level called for by the FMP; NMFS reported on the failure to meet the 16% harvest rate on age-4 chinook, and recommended that the 2005 measures include a buffer to assure that the standard was not exceeded again; and the Hoopa Valley tribe reported that it had been unable to meet its 50% tribal allocation[15] in 2004, but that it supported the escapement floor.

Following the March Council meeting, the STT prepared and disseminated the second preseason report, Preseason Report II: Analysis of Proposed Regulatory Options for 2005 Ocean

---

[14]The Klamath Fishery Management Council is an 11-member federal advisory committee that include members of the commercial and recreational fishing communities, Native American tribes, and state and federal agencies to achieve the development of mutually agreeable harvest and conservation measures.

[15]The FMP, as amended, has adopted the 1993 opinion developed by the Department of the Interior which found that the Yurok and Hoopa Valley tribes have a federally-protected right to the fishery resources of their reservations sufficient to support a moderate standard of living or 50% of the total available harvest, whichever is less.

8 - ORDER

Salmon Fisheries. In the report, four management options were analyzed, including an analysis of the socioeconomic impacts of each proposed option for the various affected coastal regions.

On March 28 and 29, 2005, public hearings were held in Washington, California, and Oregon to review the proposed regulatory options and allow for public comment.[16]

From April 3-8, 2005, the Council met in Tacoma, Washington, to finalize 2005 regulatory measures for pacific salmon. The Council heard reports from, inter alia, the KFMC, NMFS, the tribes, and the states. The prospect of amending the FMP to allow for fishing below the 35,000 naturally spawning fish escapement floor was discussed, with the Council weighing "the marginal benefit of increasing harvest versus the consequences and action necessary to enact such [a prospect]." A motion to consider lowering the escapement floor to 32,000 naturally spawning fish was discussed, but rejected. Amongst others, the Hoopa Valley Tribe supported keeping the 35,000 naturally spawning chinook escapement floor, even though it would result in the tribe suffering the second-lowest harvest on record. Further analysis of the different management options was presented to the Council from a variety of entities, and on April 7, 2005, the Council adopted final regulatory measures to submit to the Secretary, based largely on the STT's Supplemental Report of April 7, 2005, Salmon Technical Team Analysis of Tentative 2005 Ocean Salmon Fishery Management Measures, with some modifications. In relevant part, the measures provided for the following Klamath River commercial chinook seasons to be open in post-May 2005:

(1)     From Florence South Jetty, Oregon to Humbug Mountain, Oregon: open from September 1-23, 2005, and October 1-31, 2005;

(2)     From Humbug Mountain, Oregon to the Oregon/California border: open from September 3-30, 2005, or until 3,000 chinook are caught;

---

[16]Public comment was also invited at the April Council meeting in Tacoma.

9 - ORDER

(3)     From the Oregon/California border to Humboldt South Jetty, California: open from September 3-30, 2005, or until 6,000 chinook are caught;

(4)     From Horse Mountain, California to Point Arena, California: open from September 1-30, 2005.

As recognized by all parties, these open seasons and catch limits represented decreases from 2004 management regulations.

Following the Council's adoption of the salmon management measures, the STT and Council staff prepared another detailed analysis specifically of the biological and socioeconomic impacts of those measures, <u>Preseason Report III: Analysis of Council Adopted Management Measures for 2005 Ocean Salmon Fisheries</u>.  The report detailed changes from the 2004 measures, and specifically noted that the 2005 measures were substantially more restrictive than their 2004 counterparts.

On April 22, 2005, the NMFS regional administrator forwarded the 2005 management measures as approved by the Council to the National Oceanic and Atmospheric Administration ("NOAA") Assistant Administrator for Fisheries, with a request that the measures be approved.  The regional administrator summarized the proceedings leading to the adoption of the measures, the main points of contention surrounding the season limits and catch restrictions, and noted that NMFS believed the measures were consistent with the FMP, the Magnuson Act, and all other applicable laws.  Further, the administrator included recommendations that the NOAA Assistant Administrator find that good cause existed to waive the APA's notice and comment requirement, on various bases, but primarily on the basis that the additional two months of notice and comment required by the APA would force the regulations to be prepared before the scientific data needed to make the regulations could be collected and analyzed.  The NOAA Assistant Administrator adopted the recommended measures, and on May 4, 2005, they were published as final regulations in the Federal

Register, and went into immediate effect.[17]

On June 3, 2005, plaintiffs filed the complaint presently before the court, in which they challenge the 2005 management measures promulgated by the Secretary. Plaintiffs seek declaratory and injunctive relief, asking the court to invalidate the regulations on the following bases:

(1) That defendants violated the Magnuson Act and the APA because the management objective of obtaining a minimum escapement of 35,000 naturally spawning chinook inappropriately segregates out "naturally spawning" chinook, which are not an anadromous species, a fish, a fishery, or a stock of fish within the meaning of the Magnuson Act;

(2) That defendants violated National Standard Two of the Magnuson Act and the APA when they promulgated management measures which segregate out "naturally spawning" chinook, contrary to the best available scientific information;

(3) That defendants violated National Standard Three of the Magnuson Act and the APA when they promulgated management measures which segregate out "naturally spawning" chinook, therefore failing to manage all the stock as a unit or in close coordination;

(4) That defendants violated National Standard Eight of the Magnuson Act and the APA by failing to adequately analyze the economic impact of their regulations on fishing communities and/or failing to identify alternatives to minimize those impacts;

(5) That defendants violated National Standard Ten of the Magnuson Act and the APA when they promulgated regulations which failed to promote the safety of human life at sea; and

(6) That defendants violated the Regulatory Flexibility Act when they failed to perform a threshold analysis or to certify, pursuant to the RFA, the harvest regulations.

All parties have agreed that the issues presented are appropriately the subject of disposition by summary judgment, and have filed cross-motions to that end.

_____

[17]The public was allowed until May 19, 2005 to submit additional comments on the regulations, however.

## STANDARD OF REVIEW

As described above, the Magnuson Act incorporated the judicial review standards of the APA. That standard demands that the court set aside agency regulations found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The court is to determine whether the agency "has considered all the important aspects of the issue and articulated a satisfactory explanation for its action," Forest Watch v. United States Forest Service, 410 F.3d 115, 118 (2nd Cir. 2002), including a "rational connection between the facts found and the choice made." Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)). The court is to consider compliance with applicable law based on the record upon which the decisions were made. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419 (1971). If, in promulgating regulations, the agency relied on factors beyond what Congress had charged it with considering, it may be arbitrary and capricious. Oregon Natural Resources Council v. Daley, 6 F.Supp.2d 1139, 1145 (D.Or.1998). However, the court is not considering the issue de novo, and cannot simply substitute its own opinion for that of the agency. Sierra Club v. Glickman, 67 F.3d 90, 96 (5th Cir. 1995). Rather, the question before the court is whether substantial evidence in the record supports the agency's decision. Northern Wind, Inc. v. Daley, 200 F.3d 13, 17 (1st Cir. 1999) (noting also the "great deference" warranted agency decisions); see also Associated Fisheries of Maine v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

///

///

///

12 - ORDER

## DISCUSSION

### I.     Claims One - Three

#### A.     Plaintiffs' first three claims for relief are barred by the statute of limitations.

Once a final regulation is promulgated by the Secretary, the Magnuson Act provides thirty

days for challenges to that regulation.  Section 1855(f) of the Act provides, in relevant part, that:

> (1)     Regulations promulgated by the Secretary under this chapter and actions
> described in paragraph (2) shall be subject to judicial review to the extent
> authorized by, and in accordance with, chapter 7 of Title 5, if a petition for
> such review is filed within 30 days after the date of which the regulations are
> promulgated, except -
>
> > (A)     section 705 of such Title is not applicable; and
> >
> > (B)     the appropriate court shall only set aside any such regulation on a
> > ground specified in section 706(2)(A), (B), (C), or (D) of such Title.
>
> (2)     The actions referred to in paragraph (1) are actions that are taken by the
> Secretary under regulations which implement a fishery management plan,
> including but not limited to actions that establish the date of closure of a
> fishery to commercial or recreational fishing.

See also Norbird Fisheries, Inc. v. National Marine Fisheries Service, 112 F.3d 414, 416 (9th Cir.

1997) ("[Section 1855(f)(1)] deprives the district court of jurisdiction to hear an attack on the

regulations if review is not sought within 30 days of their promulgation.").

Defendants make the point that in their first three claims for relief, plaintiffs, as a

fundamental part of their argument, actually attack not the 2005 regulations but Amendment 9 of the

FMP, promulgated in 1989, which sets the 35,000 naturally spawning chinook escapement floor.

Thus, defendants argue, plaintiffs' first three claims for relief are time-barred by § 1855(f) of the

Magnuson Act, and must be dismissed.

Plaintiffs respond that they are not attacking the 1989 FMP amendment, but rather the 2005

13 - ORDER

regulations which independently implement the floor. Further, they argue, even accepting that the primary basis of their first three claims for relief is the escapement floor management objective, the challenges are not subject to dismissal because the causes of action did not accrue until there was a concrete and actual injury to plaintiffs triggered by the implementation of regulations, which did not occur until the May 4, 2005 promulgation of the 2005 fishery regulations. Plaintiffs, citing to D.C. Circuit caselaw, attest that they could not have challenged the 1989 amendment setting the escapement objective because, in isolation, that objective imposed no legal harm on them prior to the application of the objectives in later management measures. See, e.g., Public Citizen, Inc. v. United States Regulatory Comm'n, 940 F.2d 679, 680 (D.C. Cir. 1991) ("Because the intended effect of the policy statement is not clear on its face, and the Commission has yet to employ it in a specific rulemaking or licencing proceeding, we find the challenge unripe.").

I disagree with plaintiffs on both counts. First, it is clear to me that in their first three claims for relief, plaintiffs actual challenge is to the incorporation of the term "naturally spawning" in the setting of the 35,000 chinook escapement floor - an incorporation which occurred in Amendment 9 to the FMP and which was promulgated in 1989. Their challenge, in sum, is that it is arbitrary and capricious for the Secretary to segregate "naturally spawning" salmon from the stock of salmon as a whole, without regard for whether a given fish spawns at all or where it goes to spawn. However, that issue was not part of the implementation of the 2005 regulations; it was a given that the regulations would incorporate that language because of Amendment 9 to the FMP.

Amendment 9 provided, in relevant part, that the FMP be amended in the following ways:

[I]n the row for Klamath Fall Chinook, in the second column, the words "97,500 natural; 17,500 hatchery" are revised to read "35 percent of the potential adults from each brood of natural spawners, but no fewer than 35,000 naturally spawning adults

14 - ORDER

in any one year[]"; and footnote 3 is revised to read "The minimum escapement floor of 35,000 naturally spawning adults may be modified only by amendment to the FMP."

54 Fed. Reg. 19,194 (May 4, 1989). Thus, pursuant to the FMP as amended in 1989, all future management measures would include a minimum escapement floor of 35,000 naturally spawning Klamath River fall chinook, until that escapement floor was altered by amendment to the FMP.[18] By challenging the "naturally spawning" distinction, plaintiffs' challenge is to the 1989 regulation, not to that promulgated in 2005. Plaintiffs' claims one through three are thus subject to dismissal for failure to file within the 30 day window provided by statute. See, e.g., Turtle Island Restoration Network v. United States Dept. of Commerce, 351 F.Supp.2d 1048, 1053-54 (D.Haw. 2005) ("Plaintiffs attempt to frame their claims in turns of violations of the MBTA, APA, ESA, and NEPA, but in actuality Plaintiffs challenge the reopening of the Fishery and for that reason their claims are barred by the 30-day time limit under the MSA. . . . Plaintiffs' claims are not 'pure NEPA' claims as they suggest. Rather, all claims flow from the reopening of the Fishery pursuant to a properly promulgated amendment to the FMP. Therefore, judicial review is limited under 16 U.S.C. § 1855(f), and this Court lacks jurisdiction to adjudicate this matter.") (footnote omitted); see also Midwater Trawlers Coop. v. Mosbacher, 727 F.Supp. 12, 14-16 (D.D.C. 1989) ("Although plaintiff's complaint technically challenges the 1989 total allowable catch specifications, plaintiff's real grievance is with the optimum yield set in 1984. . . . Accordingly . . . because plaintiff's challenge to the 1984 optimum yield cap was not presented within 30 days of the publication of the regulation

---

[18]See also Parravano v. Babbitt, 837 F.Supp. 1034 (N.D. Cal. 1993). aff'd 70 F.3d 539 (9th Cir. 1995).

setting the optimum yield, and because other avenues for seeking judicial review remain open[19], plaintiff's claim is time barred by the thirty-day statute of limitations[.]").

Further, I do not accept plaintiffs' argument that their challenge to the "naturally spawning" distinction was unripe until the 2005 regulations implemented it. Plaintiffs ignore both the mandatory nature of the FMP's escapement goal and the history of regulations promulgated under it.

Because the FMP, as amended, includes the escapement goal as a mandatory management objective, it must be applied every season until that part of the FMP is amended. Absent such amendment, the agency cannot modify or choose to ignore the escapement floor; it forms a fundamental basis upon which the Klamath River fall chinook management measures are implemented. In essence, the only discretion the agency has each year on the issue of the minimum escapement goal is whether or not to seek amendment of the objective. Although it appears from the record that the Council considered this, there is no evidence that there was formal agency action considering and rejecting that prospect.[20] Regardless, plaintiffs do not characterize their claims as challenging such rejection. Because of the mandatory nature of the 1989 amendment to the FMP, plaintiffs have been on notice - actual or constructive - since the amendment was published that the objective of 35,000 naturally spawning chinook escape to spawn was to be applied each year. Even

---

[19]In Midwater Trawlers, the court noted that plaintiff could petition the Secretary for an amendment to the optimum yield at issue there, and that should the Secretary reject such a petition, that action would be itself reviewable. I note that plaintiffs here may similarly obtain the relief they seek (or review of the agency's denial of such relief) vis a vis the "naturally spawning" language in the FMP by means of a formal petition to the Secretary. See, e.g., Clark v. Busey, 959 F.2d 808 (9th Cir. 1992).

[20]Again, I note that plaintiffs may themselves petition the Secretary to amend the escapement goal, at which time there would be reviewable agency action.

16 - ORDER

in the absence of an immediate impact, the potential for eventual impact was clear, and a cause of action for judicial review accrued at that time.

Even assuming, arguendo, that a cause of action did not accrue until management measures using the escapement goal were promulgated in such a way as to impact plaintiffs, I note that each year's measures since 1989 have indeed been promulgated with consideration of the escapement goal, and that in some years the impacts on commercial fishers have been even greater than they are under the 2005 regulations. In 1992, for example, multiple zones of the affected fishery were closed entirely, whereas under the 2005 regulation they will be open. It is clear that the implementation of the 2005 regulations is not the first opportunity plaintiffs have had to realize that the 1989 escapement goal would impact their ability to commercially catch chinook.

For all these reasons, I find that the plaintiffs' first three causes of action are fundamentally challenging the 1989 regulations establishing the FMP escapement goals for Klamath River fall chinook, and that the time for bringing challenges to these regulations has long since passed. These claims are dismissed.

**B.**    **Plaintiff's first three claims for relief must fail in any event.**

Even assuming, arguendo, that plaintiff's first three claims for relief were not barred by the 30-day statute of limitations in the Magnuson Act, the claims would fail on their merits.

Boiled down to its essence, plaintiffs' arguments amount to analogizing the issues in this case to those before the court in Alsea Valley Alliance v. Evans, 161 F.Supp.2d 1154 (D.Or. 2001). In Alsea, the court concluded that, under the Endangered Species Act, it was arbitrary and capricious for the agency to list only naturally spawned (i.e., wild) coho salmon as "threatened" but to exclude hatchery spawned fish. Specifically, the court found that:

17 - ORDER

Listing distinctions below that of a subspecies or a DPS [distinct population segment] of a species are not allowed under the ESA. . . . NMFS concluded that nine hatchery stocks are part of the same Oregon Coast ESU [evolutionarily significant unit]/DPS as the "natural" populations but none of the hatchery stocks were included in the listing decision . . . Once NMFS determined that hatchery spawned coho and naturally spawned coho were part of the same DPS/ESU, the listing decision should have been made without further distinctions between members of the same DPS/ESU.

Id. at 1162. In this case, in contrast, the agency, in setting the escapement floor, did not fail to include hatchery spawned fish in its determination of what level of escapement was appropriate: the 35,000 fish that must escape can be wild or hatchery spawned, so long as they return up river to themselves spawn. There is no distinction made between fish origins, only a distinction made between fish spawning behavior, which is an eminently reasonable consideration when managing a fishery to maintain its long-term viability. Even were Alsea to control in this case (which it does not, as it dealt with species listing under the ESA and not stock management under the Magnuson Act) nothing in that case stands for the proposition that an agency is barred from promulgating regulations to protect the ability of a species (or, for that matter, of a stock) to reproduce naturally in the wild. Plaintiffs' interpretation of Alsea ignores the importance of naturally spawning runs to the long-term benefit of the species. That is the impact of the "naturally spawning" language of the 1989 regulation - to ensure that the escapement floor consists of fish returning to spawn, and further that they are returning to spawn in an environment where such can occur without human intervention. Such a goal does not run counter to Alsea, the Magnuson Act generally, or National Standards Two or Three.

National Standard Two, for its part, directs that the agency promulgate management measures that are based on the best available scientific information. The 1989 regulations amending the FMP

to include the escapement floor of 35,000 naturally spawning chinook provided a lengthy rationale for the setting of the floor, as did the reports and analyses informing the Council and the agency during the development of the amendment,[21] and plaintiffs have not demonstrated that the scientific bases underlying the policy were not, and are not, the best available. Indeed, plaintiffs have not provided any scientific data or analyses that suggest that requiring a set of the escaping fish to be wild spawners is not appropriate or desirable.

As to National Standard Three, while that standard instructs that "an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination," the agency has a great deal of discretion in determining what an appropriate "stock" is. The Magnuson Act defines "stock" as "a species, subspecies geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(37). The implementing regulations for determining management units note that "[t]he choice of a management unit depends on the focus of the FMP's objectives, and may be organized around biological, geographic, economic, technical, social, or ecological perspectives." 50 C.F.R. § 600.320(d)(1). Thus, biological, geographic, and ecological considerations in fixing a "stock" are appropriate - and the decision to require an escapement of naturally spawning fish would certainly seem to be acceptable under any of those considerations.

For all these reasons, plaintiffs' challenges to the segregation of "naturally spawning" chinook in setting the escapement floor, even if cognizable, must fail.

---

[21]See, e.g., the Klamath River Technical Team's 1986 report, a primary basis for the establishment of the escapement floor which found that a floor of 35,000 naturally spawning fish "would protect the reproductive potential of the stock and not allow it to fall below natural escapement levels observed since 1979."

## II.    Claim Four

### 1.    The 2005 regulations do not violate National Standard Eight.

Plaintiffs' fourth claim for relief alleges that defendants violated National Standard Eight of

the Magnuson Act, which requires that the Secretary:

> [T]ake into account the importance of fishery resources to fishing communities in
> order to (A) provide for the sustained participation of such communities, and (B) to
> the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).  Plaintiffs allege that defendants failed to analyze the impact the 2005

regulations would have on fishing communities, and failed to minimize that impact.  My review of

the administrative record, and my examination of the supplemental materials provided by both sides,

convinces me that such is not the case.

As an initial matter, while not dispositive of the question of whether defendants did, in fact,

consider the impact to fishing communities in promulgating the 2005 regulations, I note that one of

the Council's management objectives is that the Council will:

> Seek to maintain ocean salmon fishing seasons which support the continuance of
> established recreational and commercial fisheries while meeting salmon harvest
> allocation objectives among ocean and inside recreational and commercial fisheries
> that are fair and equitable, and in which fishing interests shall equitably share the
> obligations of fulfilling any treaty or other legal requirements for harvest
> opportunities.

Salmon FMP Conservation Objective Three.  A footnote to the objective provides that:

> In its effort to maintain the continuance of established ocean fisheries, the Council
> includes consideration of maintaining established fishing communities.  In addition,
> a significant factor in the Council's allocation objectives . . . is aimed at preserving
> the economic viability of local ports and/or specific coastal communities[.]

Thus, pursuant to the FMP, the initial parameters for establishing annual management measures

include a review of the impact potential measures will have on fishing communities and preserving

their economic viability.

Indeed, the record demonstrates that such consideration occurred throughout the process leading to the promulgation of the final 2005 management measures. The commercial take of the 2004 season was one of the first items analyzed, and the impact on commercial fishers and fishing communities of that season were examined. Once the analysis of the 2004 season was completed and potential 2005 regulations were proposed, the impact on fishing communities for each of the four options was considered in detail. The impact to three discrete areas in the region under each option was considered, and compared to both the 2004 season and to the 15 year average for seasons 1976-1990. Although the economic impacts of the regulations could not always be minimized, such minimization did occur where feasible, given the competing conservation objectives.[22] In the Humbug to Horse Mountain region, for example, the reduction from 2004 in the final 2005 regulations was 76% as opposed to one of the options, which called for a 91% reduction. Similarly, in the Horse Mountain to Point Arena area, the 2005 reduction was 77%, as opposed to a proposed 100%.

The bottom line is that it was known by all sides to the debate that the 2005 regulations would have a negative impact on all who derive resources - economic, spiritual, or other - from the

---

[22]Clearly, particularly in projected lean years, the conservation objectives and the fishing community economic objectives are going to be somewhat mutually exclusive. However, recognition of all users' need to preserve the fishery over the long term demands that in such years, conservation of the resource must trump some users' short term economic benefits. Thus the existence, inter alia, of the 35,000 naturally spawning chinook escapement floor. As the FMP puts it, "[t]he Council's approach to conservation objectives purposely discourages frequent changes for short-term economic or social reasons at the expense of long-term benefits from the resource."

fishery.[23]  The impact on plaintiffs, clearly, is economic.  However, economic hardship by itself is

not a basis upon which the court can set aside agency regulations promulgated under the Magnuson

Act or the APA.  Defendants did their duty under National Standard Eight and the FMP by

considering the economic impact of their proposed regulations, and minimized them where possible.

Nonetheless, "[t]he purpose of the [Magnuson] Act is clearly to give conservation of fisheries

priority over short-term economic interests."  Natural Resources Defense Council v. NMFS, ___

F.3d ___, 2005 WL 2029863 (9th Cir., Aug. 24, 2005).  As noted by the Ninth Circuit in a case

similar to the one at bar:

> [W]e are not the regulators of the north pacific halibut and sable fish industry.  The
> Secretary of Commerce is.  We cannot overturn the Secretary's decision on the
> ground that some parties' interests are injured. . . . We have authority to overturn the
> Secretary's decisions only if they are arbitrary and capricious, or contrary to law.

Alliance Against IFQs v. Brown, 84 F.3d 343, 352 (9th Cir. 1996).[24]  Here, after reviewing the

evaluations and analysis defendants undertook before promulgating the final 2005 management

measures, I cannot say that the decision to promulgate them was arbitrary, capricious, or contrary

to law.  As such, summary judgment on plaintiff's fourth claim for relief must be granted in favor

of defendants.

///

///

---

[23]Indeed, once proposed management measures were selected, NMFS even began inquiries
to find out whether the measures, once implemented, might qualify the area for a fishery disaster
designation.

[24]See also Associated Fisheries of Maine v. Daley, supra, 127 F.3d at 118 ("Although we are
not unsympathetic to the plight of the individuals who will suffer adverse consequences from the
choices embodied in the final rule, we must uphold the balance struck by the Secretary[.]").

## III.     Claim Five

### 1.     The 2005 regulations do not violate National Standard Ten

Plaintiffs' fifth claim for relief alleges that defendants violated National Standard Ten of the Magnuson Act, which provides that the Secretary, in promulgating management measures, "shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10). As is the case with standard eight, the goal of standard ten is included as an objective of the FMP. See Salmon FMP Conservation Objective Nine.

Pursuant both to National Standard Ten and the FMP conservation objective, NMFS examined whether the 2005 regulations would likely have a significant impact on public safety. It was determined that:

> The proposed action is expected to be neutral with respect to health and safety. The proposed regulations are within the range of annual regulations implemented since adoption of the salmon framework plan in 1984 and meet the considerations for weather-related safety and harvest opportunity of Amendment 8 to the Salmon FMP.

NMFS, Supplemental NEPA Analysis. The specific issue raised by plaintiffs, the safety of commercial fishers, was raised and discussed at the April meeting of the Council, the minutes of which reflect that:

> LTCDR Casad expressed concern for the safety of the fleet associated with the proposed shortened seasons, which may result in fishermen sailing during marginal conditions to pursue their limited opportunity.
>
> Mr. Anderson asked if the concern was specific to any one area. LTCDR Casad replied it was a general comment for the development of season structures.
> . . .
> Mr. Brown asked if the STT could investigate a flexible season structure to accommodate weather related concerns such as those LTCDR Casad spoke of.

Additionally, a member of the Council's advisory team wrote to the Under Secretary of Commerce

23 - ORDER

to express a variety of concerns, including the safety of commercial fishers. The Council, NMFS, and ultimately the Secretary were aware of the issue, but, balancing both the objectives of the FMP and the requirements of the Magnuson Act, made the determination that the 2005 regulations, as promulgated in their final form, were the best way to achieve such goals.[25]  Plaintiffs have not made any showing that this determination was arbitrary, capricious, or contrary to law, and I do not so find. Summary judgment on plaintiffs' fifth claim for relief is granted in favor of defendants.

## IV.    Claim Six

### A.    Defendants did not violate the Regulatory Flexibility Act

The RFA generally requires agencies to examine the economic impact that regulations it promulgates will have on small businesses and organizations.  As such, when an agency is required by law (such as the APA) to publish a notice of proposed rulemaking, it must prepare and make available for comment an initial regulatory flexibility analysis.  5 U.S.C. § 603.  Similarly, when a final rule is promulgated, if the agency is required by the APA or other law to publish a notice of proposed rulemaking, it must prepare a final RFA analysis.  5 U.S.C. § 604.

It is apparent that defendants did not specifically conduct or make available formal RFA analyses.[26]  Thus, the question before the court is whether defendants were required under the RFA

---

[25]As noted previously, the Secretary necessarily balances objectives when determining what regulations to implement, and is given, both under the judicial review standards and the language of the Magnuson Act, discretion to so balance.  See, e.g., Alliance Against IFQs v. Brown, supra, 84 F.3d at 349, noting that: "There is a necessary tension, perhaps inconsistency, among the[] objectives [of the Magnuson Act]."

[26]Defendants do argue, however, that the economic impacts of the regulations on small entities were fully analyzed, and that the substantive, if not technical, requirements of the RFA were thus met.  Because I find that defendants were not required to undertake an RFA analysis, I need not consider this argument.

24 - ORDER

to do so. Because defendants properly invoked the "good cause" exception to the APA's notice and comment provisions, I find that they were exempt from the requirements of the RFA.

Under the APA, an agency may relieve itself of the typical notice and comment obligations imposed by the APA

> when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b). In the salmon management regulations, the effect application of this exception will have is detailed:

> If NMFS determines, for good cause, that an action must be filed without affording a prior opportunity for public comment, public comments on the action will be received by NMFS for period of 15 days after filing of the action with the Office of the Federal Register.

50 C.F.R. § 660.411(b).

In the process of promulgating the 2005 salmon management regulations, defendants did avail themselves of the APA's "good cause" exception. Plaintiffs challenge the propriety of invoking this exception, noting that the Ninth Circuit construes this exception narrowly, and relying largely on the recent Ninth Circuit case Natural Resources Defense Council v. Evans, 316 F.3d 904 (9th Cir. 2003).

In Natural Resources Defense Council ("NRDC"), the Ninth Circuit found that NMFS's recitation of good cause was inadequate to waive notice and comment in the promulgation of 2001 management measures for the Pacific Coast groundfish fishery. The good cause statement in NRDC read, in full, as follows:

> This package of specifications and management measures is a delicate balance designed to allow as much harvest of healthy stocks as possible, while protecting

overfished and other depressed stocks.  Delay in implementation of the measures could upset that balance and cause harm to some stocks and it could require unnecessarily restrictive measures later in the year to make up for the late implementation.  Much of the data necessary for these specifications and management measures came from the current fishing year.  The Assistant Administrator for Fisheries, NOAA (AA) has determined that there is good cause under 5 U.S.C. § 553(b)(B) to waive prior notice and opportunity for public comment for the specifications and management measures.  Because of the timing of the receipt, development, review, and analysis of the fishery information necessary for setting the initial specifications and management measures, and the need to have these specifications and management measures in effect at the beginning of the 2001 fishing year, Amendment 4 to the FMP, implemented on January 1, 1991, recognized these timeliness considerations and set up a system by which the interested public is notified, through Federal Register publication and Council mailings, of Council meetings and of the development of these measures and is provided the opportunity to comment during the Council process. . . . Additional public comments on the specifications and management measures will be accepted for 30 days after publication of this document in the Federal Register.

Id. at 908 n.4 (quoting 66 Fed. Reg. 2338, 2371-72).  The court found that this statement was a

generic statement that did not show that any specific circumstances existed in preparation of the

2001 regulations that warranted application of the "good cause" exception, and reminded that:

[G]ood cause requires some showing of exigency beyond generic complexity of data collection and time constraints; notice and comment must interfere with the agency's ability to fulfill its statutory mandate to manage the fishery.

Id. at 906 (citing Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479 (9th Cir. 1992) and Cal-Almond,

Inc. v. United States Dept. of Agriculture, 14 F.3d 429 (9th Cir. 1993)).

However, defendants in the instant action put forth a good cause statement containing a great

deal more foundational information, as well as season specific bases, than the very general statement

in NRDC.  The good cause statement here reads as follows:

The annual salmon management cycle begins May 1 and continues through April 30 of the following year.  May 1 was chosen because the pre-May harvests constitute a relatively small portion of the annual catch.  The time-frame of the preseason process for determining the annual modifications to ocean salmon fishery

management measures depends on when the pertinent biological data are available. Salmon stocks are managed to meet annual spawning escapement goals or specific exploitation rates. Achieving either of these objectives requires designing management measures that are appropriate for the ocean abundance predicted for that year. These preseason abundance forecasts, which are derived from the previous year's observed spawning escapement, vary substantially from year to year, and are not available until January and February because spawning escapement continues through the fall.

The preseason planning and public review process associated with developing Council recommendations is initiated in February as soon as the forecast information becomes available. The pubic planning process requires coordination of management actions of four states, numerous Indian tribes and the Federal Government, all of which have management authority over the stocks. This complex process includes the affected user groups, as well as the general public. The process is compressed into a 2-month period which culminates at the April Council meeting at which the Council adopts a recommendation that is forwarded to NMFS for review, approval and implementation of fishing regulations effective on May 1.

Providing opportunity for prior notice and public comments on the Council's recommended measures through a proposed and final rulemaking process would require 30 to 60 days in addition to the 2-month period required for development of the regulations. Delaying implementation of annual fishing regulations, which are based on the current stock abundance projections, for an additional 60 days would require that fishing regulations for May and June be set in the previous year without knowledge of the current stock status. Although this is currently done for fisheries opening prior to May, relatively little harvest occurs during that period (e.g., in 2004 less than 10 percent of commercial and recreational harvest occurred prior to May 1). Allowing the much more substantial harvest levels normally associated with the May and June seasons to be regulated in a similar way would impair NMFS' ability to protect weak and ESA listed stocks and provide harvest opportunity where appropriate.

Overall, the annual population dynamics of the various salmon stocks require managers to vary the season structure of the various West Coast area fisheries to protect weaker stocks and give fishers access to stronger salmon stocks, particularly hatchery produced fish. Failure to implement these measures immediately could compromise the status of certain stocks or result in forgoing opportunity to harvest stocks whose abundance has increased relative to the previous year thereby undermining the purpose of this agency action. For example, the 2005 forecast ocean abundance for Klamath River fall Chinook requires a reduction in the commercial season length from Humbug Mountain, OR to the Oregon-California border from being open from May-June in 2004 to being closed in 2005. With out [sic] these, and

> similar restrictions in other areas in 2005, the projected Klamath River fall Chinook
> escapement floor would not be met. Based upon the above-described need to have
> these measures effective on May 1 and the fact that there is limited time available to
> implement these new measures after the final Council meeting in April and before
> the commencement of the ocean salmon fishing year on May 1, NMFS has concluded
> it is impracticable to provide an opportunity for prior notice and comment under 5
> U.S.C. [§] 553(b)(B).

70 Fed. Reg. 23,054, 23,063. This statement not only describes in detail why the process for

promulgating management measures for the Pacific salmon fishery is necessarily too short to allow

for traditional APA notice and comment periods and what the consequences of extending that

process would be - which would itself be sufficient to meet the requirements of NRDC that the

agency demonstrate exigency which imperils its ability to fulfill its duties - but the statement points

out specific reasons why the agency must invoke the APA exception in this year. Thus, neither of

the NRDC statement's failings - a lack of detail about the need, and a lack of season-specific analysis

- are present here. That the agency finds good cause each season is not, as plaintiffs suggest,

evidence that the agency gives short shrift to the annual analysis of the necessity of invoking the

waiver; even the NRDC court noted that annual good cause findings were not per se inappropriate:

> We need not determine the precise contours of what constitutes good cause in this
> context. We simply hold that NMFS failed to make a sufficient showing that good
> cause existed for 2001, as the agency did not demonstrate that some exigency apart
> from generic complexity of data collection and time constraints interfered with its
> ability to promulgate specifications and management measures.
>
> By the same token, we do not mean to suggest that habitual invocation of the good
> cause exception is itself improper. . . . NMFS should be free in future years to show
> that compliance is impracticable under specific circumstances pertinent to the year
> at issue.

NRDC, supra, 316 F.3d at 912. Because defendants here have sufficiently so shown, I cannot say

28 - ORDER

that their invocation of the good cause exception was improper.[27]  As defendants properly invoked

the exception, no RFA analyses were necessary.  Therefore, summary judgment on plaintiff's sixth

claim for relief is granted in favor of defendants.

## CONCLUSION

Defendants' motion (#57) to strike is denied.  Plaintiffs' motion (#50) for summary judgment

is denied.  Defendants' cross-motion (#59) is granted.  Intervenor-defendant Yurok Tribe's cross-

motion (#65) for summary judgment is denied as moot.  The clerk's office is directed to enter

judgment accordingly; this action is dismissed.

DATED this _8_ day of September, 2005.

Thomas M. Coffin
United States Magistrate Judge

---

[27]Indeed, my review of the administrative record and examination of the issues presented in this case convinces me that the time frame set out by defendants to create, evaluate and select annual management measures is optimized to allow for meaningful public participation while maximizing defendants' ability to adequately manage the stock as statutorily charged.

29 - ORDER